UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                              :
Dayshawn Ingram,              :
                              :
          Plaintiff,          :
                              :
     v.                       :
                              :
Michael Shipman-Meyer, et al.,:   Civil Action No. 12-1915 (GK)
                              :
                              :
          Defendants.         :
                              :
```

## MEMORANDUM OPINION

Plaintiff is Dayshawn Ingram, the son of the decedent, Anthony Chambers. Mr. Chambers died immediately after a violent encounter with the police. Plaintiff alleges that one of the police officers, Officer Michael Shipman-Meyer, illegally used a chokehold on his father, which caused his death. Plaintiff brings several claims against Officers Shipman-Meyer, William Karabelas, Stephen Rose, and Elizabeth LaDuca, as well as the District of Columbia, stemming from the death of his father.

Presently before the Court are Plaintiff's and Defendants' Cross-motions for Summary Judgment. Having reviewed the parties' respective Motions, Oppositions, Replies, and Surreplies, Plaintiff's Motion for Summary Judgment is **denied in its entirety** and Defendants' Motion for Summary Judgment is **granted in part and denied in part**.

1

I.   BACKGROUND

   A. Procedural Background

   On September 19, 2012, Plaintiff commenced this action in the Superior Court of the District of Columbia.   Subsequently, Defendants removed the case from Superior Court to this Court, pursuant to 28 U.S.C. § 1441 *et seq.*

   After extensive discovery, Plaintiff amended the Complaint he originally filed in Superior Court.   First Amended Complaint ("FAC") [Dkt. No. 37].   Count One alleges that the four officers acted negligently, violating an applicable national standard of care, resulting in Mr. Chamber's injury and death.   FAC ¶¶ 8-13. Count Two alleges that the officers committed assault and battery, resulting in in Mr. Chamber's injury and death.   Id. ¶¶ 14-17. Count Three alleges that the officers used excessive force in violation of Mr. Chamber's constitutional rights.   Id. ¶¶ 18-22. Count Four alleges that the officers engaged in tortious conduct, and thereby violated the District's wrongful death statute.   Id. ¶¶ 23-25.   Finally, Count Five alleges that the District negligently failed to train the officers in the proper use of chokeholds, resulting in Mr. Chamber's injury and death.   Id. ¶¶ 26-32.   Plaintiff seeks compensatory damages of $5,000,000 on each count.

On January 15, 2016, Plaintiff moved for partial summary judgment. Plaintiff's Motion for Summary Judgment ("Pl.'s MSJ") [Dkt. No. 56]. Plaintiff seeks summary judgment on parts of Counts One, Two, Three, and Five of his First Amended Complaint, but does not seek summary judgment as to any part of Count Four. See id. Plaintiff concedes that there is a genuine dispute as to whether or not the officers' actions caused the death of Mr. Chambers, and therefore that he cannot fully prevail on any of his claims at the summary judgment stage. Id. at 25 n.6. Instead, he essentially asks the Court to hold that he is entitled to judgment on all the other elements necessary to succeed on those claims, leaving only the issue of causation for trial. See id. Defendants filed an Opposition. Defendants' Opposition ("Defs.' Opp'n") [Dkt. No. 59].

The Defendants also cross-moved for summary judgment on all counts. Defs.' MSJ at 1. Plaintiffs filed an Opposition, to which Defendants filed a Reply, and both parties filed Surreplies. Plaintiff's Opposition ("Pl.'s Opp'n") [Dkt. No. 63], Defendants' Reply ("Defs.' Reply") [Dkt. No. 65], Plaintiff's Surreply ("Pl.'s Surreply") [Dkt. No. 68], and Defendants' Surreply ("Defs.' Surreply") [Dkt. No. 69].

## B. Factual Background

### 1. The Court Will not Rely on Defendants' Statement of Undisputed Material Facts

As a preliminary matter, Defendants argue that their statement of material facts should be accepted, virtually in its entirety, because Plaintiff failed to comply with Local Rule 7. Defs.' Analysis of Material Facts, Exh. 1 to Defs.' Reply at 1 n.1 (citing LCvR 7) [Dkt. No. 65-1]. Defendants argue that, if the Court were to do so, there are essentially no material facts in dispute in this case. Defs.' Reply at 2 n.2. In other words, Defendants ask the Court to decide this case based almost exclusively on their characterization of what occurred.

Local Rule 7 requires a party moving for summary judgment to file a "statement of material facts" that it contends are undisputed. LCvR 7(h)(1). In addition, it requires that a party opposing a summary judgment motion must respond to the moving party's statement of facts with "a concise statement" of "all material facts" that remain in dispute. Id. Where the non-movant fails to "controvert" a statement of undisputed fact made by the movant, the Court may assume that the statement is admitted. Id.; see also Broady v. Zanzibar on the Waterfront, LLC, 576 F. Supp. 2d 14, 16–17 (D.D.C. 2008).

-4-

Both Plaintiffs and Defendants filed the required Rule 7 statement with their respective motions for summary judgment. Defendants, in their Opposition to Plaintiff's Motion for Summary Judgment, filed the required response to Plaintiff's statement of material facts, indicating what facts Defendants believed remain in dispute. Plaintiff failed to respond to Defendants' statement of material facts in his Opposition to Defendants' Motion for Summary Judgment. Instead, he simply resubmitted his original statement of material facts with only a few additional facts added. Given Plaintiff's failure to comply with Local Rule 7, Defendants argue that their statement of material facts should be admitted in its entirety. See Defs.' Analysis of Material Facts (asserting that all but one of Defendants' statement of material facts not in dispute have been admitted by failure to comply with the local rule).

Though "strict compliance with the local rule" is the norm, Broady, F. Supp. 2d at 16, there are cases in which it is unwarranted. See Hedgpeth v. Rahim, 2016 WL 5720699, *5-6 (D.D.C. October 3, 2016) (refusing to admit Defendant's uncontradicted statement, where the statement was so biased that it did not accurately reflect what material facts were and were not in dispute). This is one such case.

In cases involving deadly force, "where the witness most likely to contradict the officer's story — the person [killed] — is unable to testify, courts . . . may not simply accept what may be a self-serving account by the police officer.  Instead, courts must carefully examine all the evidence in the record ... to determine whether the officer's story is internally consistent and consistent with other known facts. Courts must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably." Flythe v. District of Columbia, 791 F.3d 13, 19 (2015) (internal citations and quotation marks omitted).

Heeding the directive of the Court of Appeals, the Court carefully examined the evidence in the record to determine whether the account provided by Defendants, or any portions thereof, were contradicted by other record evidence. Flythe, 791 F.3d at 19. Having done so, the Court concludes that Defendants' Statement of Material Facts not in dispute is materially inaccurate.  It presents - as undisputed - facts that Defendants' own witnesses contradict, and it omits facts that are inconvenient to its overall narrative.   Consequently, the Court cannot simply rely on Defendants' version of what occurred in deciding these Motions.

Instead, the Court will present the relevant facts it has culled from the record and then identify the key issues of material fact that remain in dispute.

### 2. Statement of Undisputed and Disputed Facts

Anthony Chambers was 38 years old on June 8, 2012. That day he was staying with his sister, Valentina Chambers. Mr. Chambers was experiencing some sort of mental disturbance, possibly brought on by his use of PCP. Seeking assistance, Mr. Chambers contacted the Mayor's office.

Two employees of the Department of Behavioral Health ("DBH"), Linda Miller and Gary Yingling, were dispatched to the Chambers' residence to assist him. Mr. Chambers appeared agitated, telling them that a chip had been planted inside him by the government. The DBH employees asked Mr. Chambers to accompany them so that he could receive treatment, but he refused and then demanded that they leave. He threatened violence if they did not.

Believing Mr. Chambers to be a potential danger to himself or others, Miller and Yingling sought assistance from the police. They went to the First District police station, where Miller prepared a document authorizing the detention of Mr. Chambers for a psychiatric evaluation. Given Mr. Chamber's size, he stood 6' 4" tall and weighed more than 370 pounds, and prior behavior, they

asked that multiple officers accompany them to assist in detaining
and transporting him.

Four officers were assigned the task - William Karabelas,
Stephen Rose, Michael Shipman-Meyer, and Elizabeth LaDuca.
Exactly what the officers were told about their assignment is
unclear.  All the officers understood that they were acting on a
civil matter, dealing with a mentally disturbed individual, and
not there to make an arrest.  The evidence suggests that neither
the DBH employees nor the officers were aware that Mr. Chambers'
mental health episode was drug-related.  Deposition of Linda Miller
("Miller Dep.") at 19:1-4 [Dkt. No. 61-10].  However, prior to
heading to the Chambers' residence, some of the officers were
apparently informed that Mr. Chambers was a butcher by trade, and
therefore known to carry knives, and had threatened violence
earlier that day.  Significantly, Officer Shipman-Meyer was not
made aware of either of these facts.  See Deposition of Officer
Shipman-Meyer ("Shipman-Meyer Dep.") at 71:19-73:2 [Dkt. No. 61-
12]; Defs.' Analysis of Material Facts at ¶ 5.

These six people then set out for the Chambers' apartment.
Upon arriving they ascended the staircase that led to the landing
outside the apartment unit.  The DBH employees and MPD officers
stood at various points outside - on the stairs above the landing,
on the landing itself, and on the stairs below the landing - and

-8-

called for Mr. Chambers to come outside.   These six are the only living eyewitnesses to what took place on the landing.

When Mr. Chambers presented himself at the door of the apartment he was shirtless, sweaty, and appeared highly agitated. He quickly became verbally combative with the officers.   As a result, the Officers indicated that they wanted to put him in handcuffs before transporting him for treatment.   Deposition of Valentina Chambers ("Chambers Dep.") at 31:10-32:2 [Dkt. No. 61-5].   All of this was consistent with what the Officers already believed - that they were dealing with an agitated, mentally-ill individual who was in need of assistance.   Up to this point, there was no reason for them to use force against Mr. Chambers, nor did they do so.

The scene then quickly changed.   Without provocation Mr. Chambers attacked the officers.   First, he punched Officer Karabelas, causing him to fall backwards and hit his head on the wall behind him.   Next he punched Officer Rose several times in the head.   Finally, he punched Officer Shipman-Meyer in the face, causing a fracture to his left orbital bone.

It is uncontroverted that, at this point, Mr. Chambers had assaulted two of the officers, likely in violation of D.C. Code § 22-405(b), a misdemeanor, and had assaulted Officer Shipman-Meyer and likely caused him "significant bodily injury" in violation of

-9-

D.C. Code § 22-405(c), a felony.[1]  At that moment, the officers had probable cause to arrest Mr. Chambers for a crime and, given the violent nature of the crime, to use force to seize him.

They did so, though precisely what occurred is obscured by the haze of battle and inconsistent testimony.  Officers Karabelas, Rose, and Shipman-Meyer attempted to restrain and subdue Mr. Chambers, while Officer LaDuca deployed her pepper spray on Mr. Chambers.  Three of the officers, Karabelas, Rose, and Shipman-Meyer, all grabbed hold of Mr. Chambers and tried to restrain him.  Officer Karabelas testified to grabbing hold of Mr. Chambers' right arm, while both Officers Rose and Shipman-Meyer claim to have grabbed hold of his left arm.  While holding on to one of Mr. Chambers' arms, Officer Shipman-Meyer punched Mr. Chambers in the face multiple times with no success of calming him.  Officer LaDucca, who had been standing further from Mr. Chambers when the altercation began and had not been attacked, approached and sprayed Mr. Chambers in the face with pepper spray.

---

[1] "An individual suffers a significant bodily injury where there is an injury to the body . . . that necessitates the individual being taken to the hospital or receiving medical treatment shortly after the injury was inflicted. Hospitalization or medical treatment is required where it is necessary to preserve the health and well being of the individual, e.g., to prevent long-term physical damage, possible disability, disfigurement, or severe pain." Fadero v. United States, 59 A.3d 1239, 1250 n. 50 (D.C. App. 2013) (internal citations and quotations marks omitted).

After she sprayed Mr. Chambers with pepper spray, it is undisputed that the struggle between the officers and Mr. Chambers then moved from the landing into the apartment. Additionally, it is undisputed that this transition took only a matter of seconds from the time that Mr. Chambers first attacked the officers. Defs.' MSJ at 9 (quoting the various officers' depositions). There is, however, a significant dispute as to how the officers and Mr. Chambers arrived in the apartment.

According to the account presented by Defendants, they were unable to control Mr. Chambers, who used his superior strength to drag Officers Rose and Shipman-Meyer - both of whom had grabbed on to some part of his body - backwards into the apartment. Defs.' Analysis of Material Facts at ¶ 16 (Mr. Chambers "overpowered" the two officers and "dragged them backwards...against their will"); Defs.' MSJ at 8. Yet, that account does not comport with much of the evidence in the record.

First for example, Officer Karabelas, who had a hold of Mr. Chamber's right arm, makes no appearance in the Defendants' story. See Deposition of Officer Karabelas ("Karabelas Dep.") at 41:11- 52:20 [Dkt. No. 61-8] (making clear that he had a hold on Mr. Chambers' right arm from the time they were on the landing until after they entered the apartment). Perhaps that was because, unlike the other officers, he did not testify that Mr. Chambers

dragged them backward, but simply that they all "fell" together. Id. at 49:1-8; see also "Miller Dep." at 26:9-28:11 ("they all fell in").

Second, the testimony of Mr. Yingling directly contradicts the Defendants' account. He testified that the officers were able to successfully restrain Mr. Chambers' arms and knock him "off balance," sending him backwards into the apartment and down to the ground. Deposition of Gary Yingling ("Yingling Dep.") at 25:2-26:13 [Dkt. No. 61-13]. That testimony is partially confirmed by the depositions of Officers Karabelas and Rose, in which they describe having "locked-up" Mr. Chambers' right and left arms, respectively. Karabelas Dep. at 41:11-42:22, 48:5-13, 52:16-20; Deposition of Officer Rose ("Rose Dep.") at 22:7-11, 23:10-14 [Dkt. No. 61-11].

The significance of this dispute cannot be overstated. Central to the Defendants' narrative is the contention that Mr. Chambers was so strong and so violent that he was virtually uncontrollable throughout the encounter. Accordingly, Defendants assert that each of the progressively forceful measures deployed by the officers up to this point - punches, pepper spray, arm holds - failed to subdue Mr. Chambers. Defs.' MSJ at 16-17. Despite these efforts, they claim he was able to use his "super-human"

strength to "drag [the officers] backwards into his apartment against their will." Id. at 16.

However, when viewed in its entirety, there is contradictory record evidence. The record plausibly establishes that after the surprise of Mr. Chambers' attack had worn off, the officers were immediately able to gain a tactical advantage over him through a combination of their superior numbers and their own use of force - punches and pepper spray. It suggests that rather than Mr. Chambers dragging them backwards, the officers knocked him back; in other words, rather than their use of force being ineffective, it was a success.

The fight then spilled into the apartment. Valentina Chambers, Mr. Chambers' sister, and two other individuals were already inside the apartment, and came into the living room to see the commotion that was taking place.

Once inside the apartment the struggle continued, though, again, exactly what transpired is unclear.[2] Two things appear

---

[2] From this point forward, the record contains six eyewitnesses: the four officers, Mr. Yingling, and Ms. Chambers. There is no testimony in the record from the other two individuals who were inside the apartment.

All four of the officers were engaged in a struggle with Mr. Chambers, and their respective stories reflect the fact that their participation limited their ability to testify clearly or conclusively about what occurred. However, neither Mr. Yingling nor Ms. Chambers were participants in the struggle and were able

consistent from the testimony of all individuals.    First, from this point forward, there is no evidence that Mr. Chambers ever attempted to kick or strike any of the officers again.    See Yingling Dep. at 26:6-9; Rose Dep. at 25:2-26:4; Chambers Dep. at 42:19, 44:12-15 (describing Mr. Chambers as physically unable to fight back or move).    This contradicts Defendants' suggestion that Chambers was violent throughout the encounter.    Defs.' MSJ at 10.

Second, upon entering the apartment the officers almost immediately brought Mr. Chambers down to his knees.    Chambers Dep. 20:15 ("[The officers] wrestled him to the ground."); Id. at 42:9; Yingling Dep. at 25:22-27:19.    That the officers were able to get Mr. Chambers down on the ground so quickly further undermines Defendants' assertion that they found it impossible to control him.    See also Karabelas Dep. at 54:4-6 ("[Mr. Chambers] began to weaken" once they entered the apartment).

According to Defendants, at the point that Mr. Chambers was knocked to the ground but before he was placed in a chokehold, they became "separated" and lost sight of one another, with the mass of Mr. Chambers blocking the view of one of the Officers and any means of escape.    Defs.' Reply at 7; Defs.' MSJ at 9.    But

_____

to see the entirety of what transpired next.    Yingling Dep. 32:13-17 (stating he head a "clear, unimpeded view"); Chambers Dep. 21:5-22:12 (stating she was three to five steps away from the struggle).

Mr. Chambers was brought down almost instantaneously after entering the apartment, and it is not clear how he could block any of the officer's vision while on the ground. Furthermore, the room was quite small, so it is unclear how the officers could become "separated" or "fragmented" as they were no more than a few feet from one another. See Defs.' Reply at 7; Defs.' MSJ at 9; Karabelas Dep. at 50:21-22 (describing the living room as "not a big room").

From this kneeling position the officers were able to tackle Mr. Chambers to a prone position on the ground. By the time Mr. Chambers was in this prone position, Officer Shipman-Meyer had placed him in a chokehold. It is difficult to determine from the various participants' testimony how long he held Mr. Chambers in the chokehold, but it was likely no less than 20 or 30 seconds and may have been minutes.[3]

------------

[3]    The officers' testimony makes clear that the entire encounter was incredibly short, and took as little as one minute and at most "a couple minutes." See Shipman-Meyer Dep. at 107:15-20. The portion of the encounter that took place on the landing outside the apartment lasted no more than 20 seconds. See Karabelas Dep. at 46:15-47:15. While no witness provided an estimate of how long it took to bring Mr. Chambers to the ground, the fairest reading of the record is that it was also quite short. Even if the Court were to assume that it took ten or even twenty seconds to bring him to the ground, and based on the testimony even twenty seconds seems far-fetched, that would suggest that Mr. Chambers was placed in a chokehold no later than 30-40 seconds after the encounter began.

According to Defendants, Mr. Chambers continued to resist after Officer Shipman-Meyer had placed him in the chokehold, and this necessitated the continued use of the chokehold until he was incapacitated and non-responsive.[4]   Defs.' MSJ at 12.   Officer Shipman-Meyer testified that he was in a vulnerable position - face down on the floor and unable to see what was transpiring -

---

Thus, even crediting the officers' testimony implies that Officer Shipman-Meyer held Mr. Chambers in a chokehold for at least 20-30 seconds, assuming the encounter lasted no more than a minute. To the extent the encounter lasted two minutes, then Officer Shipman-Meyer would have held him in a chokehold for up to 90 seconds, although no one directly testified that the chokehold lasted that long.   And if Officer Shipman-Meyer used "a couple minutes" in the colloquial sense to mean "a few minutes," it may have been even longer.

Moreover, Plaintiff has introduced evidence of the extent and nature of Mr. Chambers' injuries which suggest that he was subject to a tracheal choke hold. See Expert Report of Dr. Jonathan Arden ("Arden Report") [Dkt. No. 61-1]; Expert Report of Fernando Yamasaki, Exh. 9 to Pl.'s MSJ at 4 [Dkt. No. 56-1] ("Yamasaki Report") (stating that Mr. Chambers neck was so large, Officer Shipman-Meyer would have been unable to place him in a pure carotid choke). Plaintiff has also introduced evidence indicating that a tracheal chokehold takes up to three minutes to render a subject unconscious, as may have occurred with Mr. Chambers.   See Marine Corps Close Combat Manual, Chapter 6 Choke Holds, Exh. 15 to Pl.'s Opp'n [Dkt. No. 63-1] ("Marine Corps Close Combat Manual").   This further supports the inference that Mr. Chambers was held in a chokehold for a significant amount of time.

[4]   According to Officer Shipman-Meyer, Mr. Chambers was lying on his left side and Officer Shipman-Meyer's right arm was around Mr. Chambers' neck in a carotid hold.   Officer Shipman-Meyer testified that he was face down on the floor, unable to see Mr. Chambers or the other officers.   He further testified that he felt vulnerable in this position, as Mr. Chambers was continuing to resist and was attempting to roll on top of him. At 78:14-88:4.

and that Mr. Chambers was attempting to roll on top of him. Shipman-Meyer Dep. at 78:14-88:4.

In contrast, testimony from Ms. Chambers, Mr. Yingling, and several of the other officers suggests that the officers already had the upper hand and that Mr. Chambers was effectively subdued by this time. Chambers Dep. at 42:16-45:5 (stating that Mr. Chambers "couldn't fight back" because he was being held in a chokehold by one officer, with multiple other officers on top of him). Similarly, Officer LaDuca testified that Mr. Chambers was face down on his stomach with Officer Shipman-Meyer on top of Mr. Chambers' back, and that Mr. Chambers was completely surrounded by the other officers. Deposition of Officer LaDuca Dep. ("LaDuca Dep") at 41:22 - 45:22, 51:3-7 [Dkt. No. 61-9]. Indeed, she describes an extended sequence in which she attempted to strike Mr. Chambers with her ASP baton while he was on the ground and then repeatedly tried to pry his arms out from under him, using the baton as a lever. LaDucca Dep. at 41:8-43:2.

Officer Karabelas, in addition to Officer LaDuca, also saw Officer Shipman-Meyer on top of Mr. Chambers and testified that he had hold of one of Mr. Chambers arms. Karabelas Dep. at 57:3-8, 58:4-5. Similarly, Mr. Yingling testified that as soon as Mr. Chambers was taken to the ground he saw multiple officers restraining both of his arms. Yingling Dep. at 27:22-28:1.

-17-

None of the other officers - nor Mr. Yingling - saw Officer Shipman-Meyer place and maintain a chokehold on Mr. Chambers. This despite the fact that they were mere feet from Officer Shipman-Meyer when he was using the chokehold and that the use of the chokehold may well have lasted at least 30 seconds - which is at least as long as all the prior events in the encounter - if not several minutes longer.

For example, despite being directly above the two and with a clear vantage point, Officer LaDuca claims to have never seen Officer Shipman-Meyer place his arms around Mr. Chambers' neck. LaDuca Dep. at 50:21-51:1-2. Similarly, Officer Rose claims not to have seen Officer Shipman-Meyer with an arm around Mr. Chamber's neck, despite being mere inches or feet away from him. Rose Dep. at 29:19-21. Officer Karabelas did see Officer Shipman-Meyer with his arms around Mr. Chambers' neck or shoulder area, but was unable to see whether or not Officer Shipman-Meyer had placed him in a chokehold. Id. at 56:21-59:2. Similarly, Mr. Yingling, who claims to have a "clear, unimpeded view" throughout the encounter, Yingling Dep. at 32:13-17, nonetheless states that he never saw Officer Shipman-Meyer use a chokehold. Id. at 31:9-12. All of this testimony is implicitly contradicted by that of Ms. Chambers, who was present for the same events, but had no trouble seeing her brother being choked. Chambers Dep. at 42:21-45:5.

Officer Shipman-Meyer maintained the hold for some indeterminate amount of time, eventually releasing Mr. Chambers when he determined that Mr. Chambers had stopped moving. At this time the other officers who had been attempting to handcuff Mr. Chambers were finally able to do so. Very shortly after placing him in handcuffs, the officers noticed Mr. Chambers was non-responsive and in apparent medical distress. The officers agree that they rolled him into an upright position on the floor and checked his pulse and breathing, but none provided emergency first-aid assistance. One of the officers, possibly Officer LaDuca, called for an ambulance. Other officers arrived on the scene, and the four officers who were involved in the melee left the apartment. Some amount of time passed before an ambulance arrived and took Mr. Chambers for treatment, but he died en route to the hospital.

None of the following material questions are conclusively resolved by the record. Did Mr. Chambers possess such "super-human" strength, that it was impossible to control him, or did the officers immediately gain an advantage in their battle with him after the surprise of his attack had faded? Did Officer Shipman-Meyer use the chokehold as a last-ditch effort to gain control of Mr. Chambers or had he already been subdued at that point? Did Officer Shipman-Meyer maintain the chokehold for only the bare

minimum of time necessary to handcuff Mr. Chambers, or did he maintain it for a significant period of time after Mr. Chambers had been subdued?

Having reviewed in great detail the testimony presented by the various witnesses, the Court has no trouble concluding that there are material facts in dispute.

## II.   STANDARD OF REVIEW

Summary judgment may be granted only if the pleadings, the discovery materials, and affidavits on file show that there is no genuine issue as to <u>any</u> material fact and that the moving party is entitled to judgment as a matter of law. <u>See Arrington v. United States</u>, 473 F.3d 329, 333 (D.C. Cir. 2006); Fed. R. Civ. P. 56(c). "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Arrington</u>, 473 F.3d at 333 (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)). A fact is "material" if it might affect the outcome of the case under the substantive governing law. <u>Id.</u>

The burden is on the moving party to demonstrate the absence of any genuine issues of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). When a moving party successfully does so, the nonmoving party must show the existence of a genuine issue of material fact by providing "specific facts showing that there

is a genuine issue for trial," and "may not rest on mere allegations or denials" to prevail. Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002) (quoting Anderson, 477 U.S. at 248 (internal quotation marks omitted). The moving party is entitled to summary judgment when the nonmoving party fails to offer evidence sufficient to establish an essential element of a claim on which it will bear the burden of proof at trial. Celotex, 477 U.S. at 322.

In reviewing the evidence on a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party and draws all inferences in her favor. Johnson v. Perez, 823 F.3d 701, 705 (D.C. Cir. 2016). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." Barnett v. PA Consulting Grp. Inc., 715 F.3d 354, 358 (D.C. Cir. 2013) (internal quotation marks and citation omitted). Accordingly, the Court's role is "not [to] determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." Id.

## III. ANALYSIS

Plaintiff brings two distinct sets of claims in this action. First, he brings claims based on a federal statute, 42 U.S.C. § 1983, against all four officers alleging that they violated his

father's constitutional rights.   Second, he brings a number of claims based on the laws of the District of Columbia against the officers and the District itself.   The Court begins with Plaintiff's federal claims before turning to his claims based on the laws of the District.

## A. Federal Section 1983 Claims against the Four Officers

Count Three of Plaintiff's Complaint alleges that the four officers violated his father's rights under the Fourth Amendment of the United States Constitution to be free from excessive force. First, Plaintiff argues that Officer Shipman-Meyer violated his father's rights by using a chokehold on him.   Second, Plaintiff argues that the other three officers violated his father's rights by failing to stop Officer Shipman-Meyer. The Court will deal with each claim in turn.

### 1. Neither Party Is Entitled to Summary Judgment on the Claims against Officer Shipman-Meyer

Plaintiff claims that Officer Shipman-Meyer used excessive force against Mr. Chambers and thereby violated 42 U.S.C. § 1983, and has moved for summary judgment.   Defendants have also moved for summary judgment arguing that the claim is barred under the doctrine of qualified immunity.   The Court begins with the issue of qualified immunity.

### a. Officer Shipman-Meyer Is Not Entitled to Qualified Immunity for his Use of a Chokehold

### i. Qualified Immunity Standard

"In order to protect officers from undue interference with their duties and from potentially disabling threats of liability, qualified immunity shields federal officials from damages suits for actions taken while carrying out their official duties." Fenwick v. Pudimott, 778 F.3d 133, 136-37 (D.C. Cir. 2015). "To defeat a defense of qualified immunity, a plaintiff must show not only that an official 'violated a constitutional right' but also that 'the right was clearly established' at the time of the violation. Id. at 137 (quoting Saucier v. Katz, 533 U.S. 194, 200-01 (2001)); see also Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014). Both prongs of the qualified immunity analysis present pure questions of law. See Scott v. Harris, 550 U.S. 372, 381 n. 8 (2007).

In deciding a motion for summary judgment on the basis of qualified immunity, the plaintiff is the non-moving party, and the Court resolves all issues of material fact in her favor. Scott, 550 U.S. at 378-79. In cases involving deadly force, the Court does not simply accept the account of the officers, but instead, carefully examines all the evidence to determine whether a rational

jury could conclude that the officer acted unreasonably.  Flythe, 791 F.3d at 19.

### ii. Prong 1: Officer Shipman-Meyer Violated the Constitution

Defendants argue that Officer Shipman-Meyer is entitled to qualified immunity because his use of a chokehold on Mr. Chambers was reasonable and therefore did not violate the Fourth Amendment.

"Apprehension of a suspect through deadly force, i.e., killing him, qualifies as a Fourth Amendment seizure, and is therefore unlawful unless objectively reasonable in light of the facts and circumstances confronting [the officer]."  Flythe v. District of Columbia, 791 F.3d at 18 (citing Tennessee v. Garner, 471 U.S. 1, 7 (1985) and Graham v. Connor, 490 U.S. 386, 397 (1989) (internal quotation marks omitted)).  "To assess the reasonableness of a seizure, [the Court] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion."  Johnson v. District of Columbia, 528 F.3d 969, 974 (D.C. Cir. 2008).

The Court "give[s] careful attention to the facts and circumstances of the particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively

resisting arrest or attempting to evade arrest by flight." Johnson, 528 F.3d at 974. The Court "analyze[s] this question from the perspective "of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Plumhoff, 134 S. Ct. at 2020.

In assessing an officer's use of deadly force, the test does not differ from a claim involving less-than-deadly force; the sole inquiry is whether the force used was objectively reasonable. Scott, 550 U.S. at 381-83. However, the "nature and quality" of the intrusion on the individual's Fourth Amendment interest is at a maximum in a deadly force case because she has been deprived of her greatest liberty interest, her life. Accordingly, the primary focus is on whether the government's interests can justify that intrusion. Ordinarily, the use of deadly force is reasonable where an individual "poses an actual and imminent threat to the lives of the officers involved" or other individuals. See Flythe, 791 F.3d at 18.

In this case, the Court is called upon to determine whether Officer Shipman-Meyer's use of a chokehold on Mr. Chambers was reasonable. In order to make this assessment, the Court begins with a discussion of the chokehold procedure.

The term "chokehold" is imprecise, as it encompasses two seemingly distinct control procedures. One of these procedures is

the "carotid hold" in which "an officer positioned behind a subject places one arm around the subject's neck and holds the wrist of that arm with his other hand. The officer, by using his lower forearm and bicep muscle, applies pressure concentrating on the carotid arteries located on the sides of the subject's neck. The carotid hold is capable of rendering the subject unconscious by diminishing the flow of oxygenated blood to the brain." Lyons v. Los Angeles, 461 US. 95, 97 n.1 (1983). The carotid hold, when properly applied, renders the subject unconscious in a matter of seconds. Marine Corps Close Combat Manual at 1.

The term "chokehold" may also refer to "tracheal holds," also known as "bar arm" holds. Yamasaki Report at 1; see also Lyons, 461 U.S. at 97-98. In this procedure an officer positioned behind the subject uses his arm or arms in a manner similar to the "carotid hold," but applies pressure to the subject's trachea, reducing the flow of oxygen to the subject's lungs. The tracheal hold is also able to render a subject unconscious, but ordinarily takes far longer than the carotid hold to do so. The record in this case suggests that a tracheal hold takes anywhere from 2-3 minutes to render a subject unconscious, even when correctly applied. Marine Corps Close Combat Manual at 1.

The two procedures are often discussed as though they are wholly distinct. In practice it is difficult to apply one without

-26-

also applying the other. Yamasaki Report at 1. For example, an officer may seek to place an individual in a carotid hold but inadvertently apply pressure to the subject's trachea, cutting off air flow to the subject's lungs as well as his brain. Id. In that case, the officer has effectively placed the subject in both a carotid and tracheal hold. It is especially difficult to apply one type of hold where the officer and subject are engaged in a physical struggle because the movement of both officer and subject prevent the officer from precisely directing where she applies pressure to the subject's neck. Id.

It is self-evident that both forms of chokeholds are potentially lethal. To live, a human needs oxygenated blood to be delivered to the brain and needs a sufficient amount of oxygen to be delivered to the lungs. Chokeholds arrest these processes, and if held for a sufficient amount of time necessarily carry the potential for death. Lyons, 461 U.S. at 117 n. 7 (Marshall, J. dissenting).[5]

For these reasons, the application of any chokehold is properly considered the application of deadly force. See Coley v.

---

[5]   The lengthy duration of a chokehold is not the only mechanism that may cause death. Lyons, 461 U.S. at 117 n. 7 (Marshall, J. dissenting). Even chokeholds of a short duration can damage structures in the neck, thereby leading to asphyxiation. In addition, carotid holds may trigger processes in the central nervous system that lead to cardiac arrest. Id.

Lucas County, 799 F.3d 530, 541 (6th Cir. 2015) (describing a chokehold as "deadly physical force"); Nava v. Dublin, 121 F.3d 453, 458 (9th Cir. 1997) (letting stand district court finding that carotid hold constitutes "deadly force"), overruled on other grounds in Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999).   Indeed, the District of Columbia itself has statutorily established that the application of a chokehold by a law enforcement officer "constitutes the use of lethal force."   DC St. § 5-125.01.

The nature of a chokehold informs the excessive force analysis in subtle, but significant ways.   While some applications of force, such as a gunshot, are instantaneous and discrete, the application of a chokehold is not; it is, instead, continuous.   When an officer shoots an individual, there is a single decision point, whether or not to pull the trigger.   Thus, in determining whether an officer's shooting of an individual was reasonable, the analysis properly focuses on what transpired before she pulled the trigger.

In contrast, a chokehold is applied to a subject and then held for some indeterminate period of time.   Once applied, the officer retains the ability to release the hold.   Consequently, in the context of a chokehold case, the analysis of whether an officer acted reasonably focuses not only on the decision to apply the hold in the first instance but also on the officer's continued

-28-

application of the hold.   An officer may act reasonably in
initially placing a subject in a chokehold - because the subject
poses a threat - but act unreasonably in her continued application
of the hold because the threat has passed.   See Flythe, 791 F.3d
at 22 ("Justification for deadly force exists only for the life of
the threat.").

With these principals in mind, the Court analyzes the facts,
known to Officer Shipman-Meyer from the time he first placed Mr.
Chambers in a chokehold until the time he released him, in order
to determine whether the Officer's conduct was reasonable.   Officer
Shipman-Meyer knew that Mr. Chambers was an agitated, mentally-
ill man, who had threatened or menaced the DBH employees, but he
had no reason to believe that Mr. Chambers had committed a crime
or was armed.

Very soon after the officers' arrival at the Chambers'
residence, Mr. Chambers became violent, launching a surprise
attack against Officer Shipman-Meyer and his colleagues.   They
responded with force, punching and pepper spraying him, and quickly
knocked him to his knees and then to the ground.   Once on the
ground, two of the officers effectively restrained Mr. Chambers'
arms, while Officer Shipman-Meyer straddled his back.   All the
while Officer LaDuca stood at the ready to assist her fellow

officers.  At this point, the officers had effectively subdued Mr. Chambers.

At some point during all this chaos - but certainly no later than when Officer Shipman-Meyer was on top of Mr. Chambers' back - Officer Shipman-Meyer put him in a chokehold.  Yet, once Mr. Chambers was subdued - and despite the fact that he was outnumbered, did not possess a weapon, had never attempted to grab a weapon, and that his crime was assaulting the officers with his bare hands - Officer Shipman-Meyer continued choking him - potentially for 90 seconds, if not more - until he became non-responsive.  The Court concludes that it was unreasonable for Officer Shipman-Meyer to continue choking Mr. Chambers after the officers had subdued him.

The use of force on a suspect who has already been subdued is plainly excessive.  See e.g.  Baker v. City of Hamilton, 471 F.3d 601, 607 (6th Cir. 2006) ("We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law."); Abbott v. Sangamon County, 705 F.3d 706, 732 (7th Cir. 2013) ("police officers cannot continue to use force once a suspect is subdued")  "This prohibition against significant force against a subdued suspect applies notwithstanding a suspect's previous behavior — including resisting arrest, threatening officer safety, or potentially

-30-

carrying a weapon." Miller v. Gonzalez, 761 F.3d 822, 829 (7th Cir. 2014).

Accordingly, courts have consistently held that officers may not continue to use chokeholds and other similarly lethal restraints on a suspect after he has been subdued. See Drummond v. City of Anaheim, 343 F.3d 1052 (9th Cir. 2003) (it was excessive force for two officers to sit on subject - causing him "positional asphyxia" - after he had been subdued); Weigel v. Broad, 544 F.3d 1143 (10th Cir. 2008) (sitting on subject after he has been subdued, causing asphyxiation, constitutes excessive force), cert denied, 556 U.S. 1236 (2009); Booker v. Gomez, 745 F.3d 405 (10th Cir. 2014) (continued use of chokehold on subject after he had been subdued constituted excessive force, even though he had tried to punch the officer).

The reason for such a rule is obvious: once an individual has been effectively subdued, she no longer poses a significant threat to the officers or others, and therefore the need to use force has ended.

In Drummond, a man called the police to assist his neighbor, who was experiencing a mental health episode. 343 F.3d at 1054. Three officers knocked the neighbor to the ground and handcuffed him. Id. Despite the fact that he was subdued and face down on the ground, two officers placed their weight on his neck and torso

to further restrain him.  Id. at 1054-55.  The combined weight of the officers caused Drummond to experience positional asphyxia and put him into a permanent vegetative state.  Id. at 1055, 1057. The court held that once Drummond was on the ground and subdued he no longer posed a threat to the officers and others.  Id. at 1057-58. Consequently, the officers' decision to restrain him in a manner that was likely to asphyxiate him was unreasonable and excessive.  Id. at 1058-60.

In Weigel, the police and Weigel were involved in a car accident on the highway.  544 F.3d at 1147.  After the accident, Weigel began behaving erratically, running into traffic.  Id. at 1148.  The officers tackled Weigel and tried to restrain him, but he resisted their efforts.  Id.  Eventually, they handcuffed him and tied up his legs but he continued to struggle, so one of the officers sat on his torso while a bystander sat on his legs for several minutes.  Id.  Weigel was asphyxiated as a result of the pressure on his chest and died.  Id.

The Court held that the officers should have known that restraining Weigel in this manner was potentially lethal.  Id. at 1153.  Given that they had already subdued him, the court held that their use of a potentially-lethal restraint was unreasonable and excessive.  Id.

-32-

In this case, Mr. Chambers was significantly outnumbered by the police.  Three officers had effectively pinned Mr. Chambers to the ground and gained control of his arms, while a fourth officer stood at the ready to assist them.  Under such circumstances, the officers had subdued Mr. Chambers, and he did not "pose[] an actual and imminent threat to the lives of the officers involved" or other individuals.[6]  See Flythe, 791 F.3d at 18.  Once he was subdued, continued use of the chokehold was unnecessary and therefore unreasonable and excessive.

Officer Shipman-Meyer was aware of all of these relevant facts, and it should have been obvious to him that the extended use of a chokehold was potentially lethal.[7]  Consequently, his

---

[6]   The fact that Mr. Chambers was not handcuffed at this stage does not mean he was not subdued.  See Malory v. Whiting, 489 Fed. Appx. 78, 86 (6th Cir. 2012) (unpublished) (holding that although Plaintiff was not handcuffed, he was nonetheless subdued, and therefore, forced use was unreasonable); Laury v. Rodriguez, 659 Fed. Appx. 837, 844 (6th Cir. 2016)(unpublished) (describing Malory as rejecting argument that the right to be free from excessive force once subdued was not clearly established because the plaintiff was not handcuffed).

[7]   The District's statutes establish that the use of a chokehold constitutes "lethal force", DC St. § 5-125.01.  Given the common law presumption that "every person [knows] the law," Cheek v. US, 498 U.S. 192, 199 (1991), it is appropriate to presume a reasonable MPD officer was aware of that fact.  See Kleinberg v. Clements, 2012 WL 1019290, *9 (D.N.J. March 23, 2012) ("police officers are presumed to know the law"); Brewer v. Hayman, 2009 WL 2139429, *8 (D.N.J. July 10, 2009).

decision to maintain a chokehold on Mr. Chambers after he had been subdued was objectively unreasonable.[8]

Moreover, the fact that Mr. Chambers resisted the officers' attempts to handcuff him and was not handcuffed until after the chokehold was released does not alter the analysis. A number of courts have held that it is unreasonable for an officer to use a chokehold in order to make an arrest, simply because the individual resists being handcuffed.

In Thompson v. Chicago, the court held that an officer was not entitled to qualified immunity where he used a chokehold in order to arrest a suspect who had both fled and fought with the police. 2004 WL 1197436 (May 28, 2004 N.D. Ill.). In Thompson, two police officers were on patrol and saw Thompson engage in an apparent drug purchase. Id. at *1-2. Thompson saw the officers and fled in his car. Id. The officers pursued him, and several other cars joined the chase before Thompson crashed. Id.

Thompson emerged from the car, and two of the many officers on hand attempted to subdue him. Thompson punched one of the two officers, which resulted in a physical struggle. Id. All three fell to the ground and Thompson continued to struggle as the

---

[8] This is sufficient, in and of itself, to defeat Officer Shipman-Meyer's arguments on the first prong of the qualified immunity analysis.

officers attempted to handcuff him.  Id.  One of the officers was able to climb on Thompson's back and place him in a chokehold, which he maintained until Thompson was eventually handcuffed. Shortly thereafter, Thompson began to exhibit signs of respiratory distress and eventually died.  Id.

Despite Thompson's potential drug crime, attempt to flee from arrest, violent assault of a police officer, and subsequent attempts to resist being handcuffed and arrested, the court held that the officer was not entitled to qualified immunity.  Id. at *5.  Even under this set of facts, the court held that the use of deadly force, in the form of a chokehold, was excessive and unreasonable.  Id.  Indeed, the defendants themselves conceded that the use of a chokehold was unreasonable and violated the Fourth Amendment.[9]  Id.

Similarly in Griffith v. Coburn, the court held that an officer lacked qualified immunity where he had been called by Arthur Partee's mother - because he was experiencing a mental health issue - and he placed Mr. Partee in a chokehold after Partee

---

[9] The Defendants denied that any officers had used a chokehold and a jury ultimately acquitted the officers on the claim of excessive force.  See Thompson v. Chicago, 472 F.3d 444 (7th Cir. 2006). However, the jury's decision does not alter or displace the district court's conclusion that use of a chokehold constituted deadly force and that deadly force was unauthorized under the circumstances.

resisted the officer's attempts to handcuff him.   473 F.3d 650,

651-53 (6th Cir. 2007).   The officers lacked authority to

involuntarily commit Partee, but - in order to get him treatment

- decided to arrest him on an outstanding warrant stemming from a

traffic ticket.   Id.   Partee refused to go with the officers, and

when they attempted to handcuff him, he resisted their attempts to

do so.   Id.   During the course of the struggle, one of the officers

claimed Partee attempted to grab his gun, and put him in a

chokehold, leading to his death.   Id. at 654.

On this set of facts the court held that a jury could find

that the officer's use of the chokehold was excessive and

unreasonable.   Id. at 657-58.   The court did so even after

accepting the officer's contention that Partee had attempted to

grab his gun.   Id.   The court reasoned that, despite this attempt

to grab the gun, Partee never actually posed a threat to the

officers because he was unsuccessful in grabbing the gun.   Id.

The court held that, absent such a real threat, the officer lacked

justification to use deadly force against Partee.   Id.

Thompson and Griffith both make clear that the use of a

chokehold simply as a tool of effecting an arrest is not

reasonable.   Chokeholds are not justified simply because a suspect

resists being handcuffed, or even punches an officer.   Instead,

the suspect must have done something that makes him a threat to

the lives of the officers or others.  In this case, when the facts are viewed in a light most favorable to Plaintiffs, Defendants cannot demonstrate that Mr. Chambers posed this level of threat.

The Defendants' counterarguments are unpersuasive.  The Defendants claim that the following factors, when considered in their totality, justify Officer Shipman-Meyer's use of deadly force: the officers were injured, exhausted, and losing their battle with Mr. Chambers when Officer Shipman-Meyer placed him in a chokehold; additional individuals were present in the apartment, instilling further fear in the officers; and Mr. Chambers continued to resist throughout the encounter and had been extremely violent at its outset.

As to the first factor - whether the officers were losing their battle with Mr. Chambers - that is a question of fact for the jury.  As discussed above, even accepting the officers' claim that they were injured and exhausted, there is evidence in the record suggesting that the officers had effectively subdued Mr. Chambers despite their physical condition.  Accordingly, a jury could reasonably choose to disbelieve Defendants' account and conclude that continued application of the chokehold was unreasonable and excessive.

As to the presence of other individuals in the apartment, that fact is wholly unpersuasive.  There was no basis for

-37-

suspecting that those individuals were criminals or coconspirators, because the officers were there on a mental health call, not in response to a report of criminal activity.  Thus, there was no objective basis to regard them as a threat.[10]

The fact that Mr. Chambers attacked the officers does not change this calculus because - from the officers' vantage point - his violence was the result of a mental health issue and not connected to any underlying criminal activity.  While the presence of criminal accomplices may increase the danger perceived by a reasonable officer, the Defendants fail to identify any case in which the presence of innocent bystanders validates a heightened perception of danger by an officer.  As the officers had no objective basis for perceiving these other individuals as a threat, their presence does not justify any additional force beyond that which was reasonable had they not also been in the apartment.

Defendants' argument that use of the chokehold was justified by Mr. Chambers' continued resistance also fails.  The evidence, viewed in a light most favorable to plaintiff, casts doubt on the notion that Defendant was violently resisting when he was placed

---

[10] Moreover, the actions of these individuals confirmed to the officer's that they were not a threat.  For example, the officers heard the occupants of the apartment discuss the need to let the police do their job and not interfere.  Karabelas Dep. at 66:8-12; Yingling Dep. at 29:15-19.

in a chokehold.   Instead, the record suggests that after the initial punches thrown on the landing, Mr. Chambers did not throw or land a single punch, kick or other blow, at least in part because the officers had successfully subdued him.

The officers argue that even if he was unable to land another blow, Mr. Chambers continued to struggle while he was on the ground and in a chokehold.   The only real description of what this struggle entailed was given by Officer Shipman-Meyer who described Mr. Chambers as "flailing" and "rolling."   Shipman-Meyer Dep. 80:14-21, 87:17-88:4.

Yet, as Plaintiff's expert points out, such behavior is a virtually automatic, subconscious response to being manually asphyxiated. Yamasaki Report at 3.   That an individual, who is literally being choked to death, would flail in response would be obvious to any reasonable person, including Officer Shipman-Meyer. Accordingly, the Court cannot credit Defendants' attempts to characterize these movements as violent resistance.   In light of the other evidence suggesting that Mr. Chambers was effectively subdued, these movements, whatever they were, would not justify Officer Shipman-Meyer's continued use of the chokehold.

Ultimately, the heart of the Defendants' argument is that Mr. Chambers had violently attacked the officers, and therefore, it was reasonable for Officer Shipman-Meyer to place him in a

-39-

chokehold until he was handcuffed.  Defendants' argument ignores the evidence suggesting that Officer Shipman-Meyer continued to choke Mr. Chambers after the officers had effectively subdued him. There is a clear "prohibition against significant force against a subdued suspect...notwithstanding a suspect's previous behavior...."  Miller, 761 F.3d at 829.  As our Court of Appeals has said, "That an individual at one point posed a threat does not grant officers an irrevocable license to kill."  Flythe, 791 F.3d at 22.

For all these reasons, the Court finds that a jury could reasonably conclude that Officer Shipman-Meyer's use of a chokehold was objectively unreasonable and violated Mr. Chambers' rights under the Fourth Amendment.

### iii.  Prong 2: The Right to Be Free from Deadly Force once Subdued Was Clearly Established

Though a reasonable jury could conclude that Officer Shipman-Meyer used excessive force in violation of the Fourth Amendment, he is still entitled to qualified immunity if the right to be free of such force was not clearly established at the time of the violation, which was June 8, 2012.

This prong of the qualified immunity analysis "begin[s] by establishing the appropriate level of generality at which to analyze the right at issue." Johnson v. District of Columbia, 528

F.3d 969, 975 (D.C. Cir. 2008). It is insufficient to ask whether Mr. Chambers had a right to be free from unreasonable seizure. Id. Instead, the "dispositive inquiry...is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. In this case, the relevant question is whether a reasonable officer would have known that it is unlawful to use a potentially lethal restraint, such as a chokehold, on an individual who has already been subdued by multiple officers.

"To determine whether the officer[] 'strayed beyond clearly established bounds of lawfulness,' [the court] look[s] first to 'cases of controlling authority.'" Wesby v. District of Columbia, 675 F.3d 13, 26 (quoting Youngbey v. March, 676 F.3d 1114, 1117 (D.C. Cir. 2012) (internal citations omitted)). "If there is no such controlling authority, then [the court] must determine whether there is 'a consensus of cases of persuasive authority.'" Youngbey, 676 F.3d at 1117 (quoting Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2084 (2011)). The court "need not identify cases with materially similar facts, but ha[s] only to show that the state of the law at the time of the incident gave the officer[] fair warning that [her] particular conduct was unconstitutional." Wesby, 765 F.3d at 26.

It is clear that as of June 8, 2012, a reasonable officer would have been on notice that she could not choke to death an unarmed subject who had already been subdued by fellow officers. An officer may use deadly force where a suspect "pose[s] an actual and imminent threat to the lives" of the officer or others. Scott, 550 U.S. at 384.  Once a suspect is subdued, they no longer pose a sufficient threat to justify the use of force.  See Abbott v. Sangamon County, 705 F.3d 706, 732 (7th Cir. 2013) ("it was well-established in 2007 that police officers cannot continue to use force once a suspect is subdued" (emphasis added)); Baker, 471 F.3d at 607 ("We have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law.").

Moreover, a number of Courts of Appeals have held that once a suspect has been subdued, officers may not continue to use potentially-lethal methods of restraint, such as chokeholds.  See Drummond v. City of Anaheim, 343 F.3d 1052 (9th Cir. 2003); Weigel v. Broad, 544 F.3d 1143 (10th Cir. 2010).  This represents a sufficiently robust consensus of cases of persuasive precedent, and should have put Officer Shipman-Meyer on notice that his continued application of the chokehold after Mr. Chambers was subdued was excessive.

When viewed in a light most favorable to Plaintiff, the facts suggest that Mr. Chambers was already subdued and that a reasonable officer in that situation would have recognized that continuing to keep Mr. Chambers in a chokehold was unreasonable, excessive, and in violation of the law as it stood at the time.  For that reason Officer Shipman-Meyer is not entitled to qualified immunity.

### b. The Plaintiff Is also Not Entitled to Summary Judgment

Plaintiff has also moved for summary judgment on his claim of excessive force against Officer Shipman-Meyer.  Resolving the disputed material facts in favor of the Defendants, the non-movants, and viewing the facts in the light most favorable to them, the Court concludes that the Plaintiff is not entitled to summary judgment.

It is undisputed that Mr. Chambers launched a surprise attack on the officers, seriously injuring one of them.  The officers then attempted to restrain him, but their punches and pepper spray had little effect on him.  Instead, Mr. Chambers used his super-human strength to drag them backwards into the apartment, where they all fell to the ground.  As the officers were outmatched and unable to control Mr. Chambers, Officer Shipman-Meyer used a last-ditch maneuver to bring him to the ground.  He immediately placed him in a carotid hold, which lasted the minimum time necessary to

-43-

render Mr. Chambers unconscious, no more than twenty seconds.  At that point, with Mr. Chambers finally subdued, Officer Shipman-Meyer released the hold, and his fellow officers handcuffed Mr. Chambers.

Under those facts, a rational jury could conclude that Officer Shipman-Meyer reasonably feared for his own life and those of his fellow officers and, therefore, that his use of a chokehold was objectively reasonable.  It is true that both <u>Griffith</u> and <u>Thompson</u> suggest that resisting arrest, even when done violently, does not justify the use of a chokehold on an unarmed suspect.  <u>See</u> <u>Griffith</u>, 473 F.3d 650 and <u>Thompson</u>, 2004 WL 1197436.  However, unlike those cases, Mr. Chambers was able to seriously injure - with his bare hands alone - at least one of the officers.  Moreover, if the officers' testimony is credited, he possessed super-human strength - possibly as a result of his consumption of PCP - that prevented them from controlling him in order to make an arrest. Given those additional factors, a jury could conclude that Mr. Chambers possessed a threat to the lives of the officers, even though he was unarmed.  In light of this threat, a jury could find that a chokehold was the only available means to gain control of Mr. Chambers and that Officer Shipman-Meyer's decision to do so until Mr. Chambers was subdued was objectively reasonable.

-44-

In addition, Plaintiff cannot demonstrate that the right to be free of force under these circumstances was clearly established at the time of the incident. Specifically, Plaintiff cannot demonstrate that a reasonable officer would be on notice that he was prohibited from using a chokehold on a violently resisting suspect who he and his fellow officers were <u>unable to subdue</u> through other means. Plaintiff has not identified any controlling case in this Circuit that addresses a similar factual scenario. Virtually all of the cases from other Circuits address a scenario in which the officers proceeded to use a potentially lethal restraint <u>after</u> the subject was subdued.

Whether Officer Shipman-Meyer continued to choke Mr. Chambers after he had been subdued is the key fact in the qualified immunity analysis. But it is also one of the central facts in dispute. Accordingly, neither the Defendants nor Plaintiff are entitled to summary judgment on the qualified immunity issue because this case "presents the exceptional situation in which the [] court cannot complete its qualified immunity analysis without first determining disputed material facts." <u>Maestas v. Lujan</u>, 351 F.3d 1001, 1009-10 (10th Cir. 2003).[11]

---

[11]    However, that "does not mean that the officers cannot reassert their qualified immunity claims at and after trial when the factual disputes have been resolved." <u>Dixon</u>, 922 F.2d at 1463; see also <u>Figueroa-Rodriguez v. Aquino</u>, 863 F.2d 1037, 1041 n. 5 (1st Cir.

## 2. Neither Party Is Entitled to Summary Judgment on the Claims of Bystander Liability

Plaintiff also argues that the other officers, LaDuca, Rose, and Karabelas, can be held liable for Officer Shipman-Meyer's use of a chokehold because they failed to intervene to stop him from violating Mr. Chamber's rights.  Pl.'s Opp'n at 25-26.  Both parties have moved for summary judgment on this claim, but because there are issues of material fact in dispute, neither party is entitled to it.

"[A] plaintiff can show that [an] officer is liable under a theory of bystander liability. Under that theory, an officer is held liable for a constitutional violation if he: (1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Matthews v. District of Columbia, 730 F. Supp. 2d 33, 39 (D.D.C. 2010) (internal citations and quotation marks omitted); see also Moore v. District of Columbia, 79 F. Supp. 3d 121, 134-35 (D.D.C. 2015).

In this case, there are significant issues of material fact in dispute that preclude judgment for either side.  As discussed above, a jury could reasonably conclude from the record: 1) that

_____

1988) ("A defendant who has appropriately pleaded the affirmative defense of qualified immunity may establish his right to immunity at any point in the proceeding, including at trial.").

Officer Shipman-Meyer held Mr. Chambers in a chokehold despite the fact he was subdued; 2) that this chokehold lasted for a significant period of time after Mr. Chambers was subdued; and 3) given the amount of time Mr. Chambers was in the chokehold and the fact that the other officers were mere feet from what transpired, that they saw all of this.

First, should a jury resolve those questions in favor of the Plaintiff, all three elements of bystander liability would be satisfied. The three other officers were present for the entire sequence of events, and thus, may well have observed everything that Officer Shipman-Meyer did, contrary to their denials.[12] What is more, the Court has already concluded that the right to be free of excessive force under these circumstances was clearly established at the time. Thus, if a jury concluded that Officer

---

[12] The Defendants argue that because the other officers deny even seeing Officer Shipman-Meyer use a chokehold, they cannot be held liable under a bystander liability theory. If that fact was not in dispute, as they assert, they would be correct. But as the Court has already discussed, there is reason to doubt the other officers' accounts.

When viewed in a light most favorable to Plaintiff, the facts suggest that some if not all of the other officers saw Officer Shipman-Meyer use a chokehold. Again, the facts suggest that he may have employed the chokehold for minutes. While it was used, the other officers were within feet, perhaps inches, of Officer Shipman-Meyer. Under those circumstances, the other officers' testimony that they did not see any use of a chokehold is implausible.

Shipman-Meyer used excessive force, it could also reasonably conclude that the other officers knew that Officer Shipman-Meyer was violating Mr. Chambers' constitutional rights.

Second, given that Mr. Chambers was subdued by the officers, when the facts are viewed in a light most favorable to Plaintiff, a jury could also reasonably conclude that the other officers had a reasonable opportunity to prevent the violation by getting Officer Shipman-Meyer to release the chokehold. Third, there is no evidence in the record that any of the officers did anything to get Officer Shipman-Meyer to end the chokehold. Indeed, they all deny ever seeing him use a chokehold, which necessarily forecloses them from arguing that they attempted to stop it.

By the same token, when the facts are viewed in a light most favorable to the other officers, Plaintiff is not entitled to summary judgment. Given that the chokehold may have lasted no more than fifteen to twenty seconds and that the officers claim they were all attempting to restrain Mr. Chambers during the midst of a violent struggle, a jury could reasonably credit the officers' testimony that they did not see Officer Shipman-Meyer place Mr. Chambers in a chokehold. If the other officers did not see Officer Shipman-Meyer use the chokehold, Plaintiff cannot show that they were aware that his rights were being violated. That alone is

sufficient to defeat Plaintiff's theory of bystander liability, and thus precludes summary judgment on his behalf.

Consequently, neither party is entitled to summary judgment on the claim of bystander liability against Officers LaDuca, Rose, and Karabelas.

## B. Claims Based on DC Law

The remainder of Plaintiff's claims are brought pursuant to the laws of the District of Columbia. The Court begins with Count Two, claiming that the officers committed an assault and battery. FAC at ¶¶ 14-17. Next, the Court turns to Count One, claiming that Officer Shipman-Meyer was negligent in his use of a chokehold. FAC at ¶¶ 8-13. The Court then addresses Count Five, claiming that the District was negligent in its training of officers on the use of chokeholds. FAC ¶¶ at 26-32. Finally, the Court addresses Count Four, claiming wrongful death. FAC at ¶¶ 23-25.

### 1. Count Two: Assault and Battery

Plaintiff alleges that each of the officers committed an assault and battery in violation of District of Columbia law. He advances two theories of liability in support of this claim. Pl.'s Opp'n at 27-28. First, Plaintiff argues that Officer Shipman-Meyer's use of a chokehold constitutes assault and battery. Id. Second, Plaintiff argues that if Officer Shipman-Meyer's use of a

chokehold constitutes assault and battery, Officers LaDuca, Karabelas, and Rose also committed assault and battery because they aided and abetted him. Id. Both parties have moved for summary judgment.

### a. Neither Party Is Entitled to Summary Judgment on the Claim that Officer Shipman-Meyer Committed Assault and Battery

Defendants argue that Officer Shipman-Meyer had a qualified privilege to use a chokehold on Mr. Chambers and that he is therefore entitled to summary judgment. Defs.' MSJ at 19-21.

Just as qualified immunity is a shield against liability in Section 1983 excessive force claims, qualified privilege protects officers in common law claims of assault and battery. District of Columbia v Chinn, 839 A.2d 701, 705-06 (D.C. 2003). "A police officer has a qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary." Scales v. District of Columbia, 973 A.2d 722, 730 (D.C. App. 2009). "[T]he test for qualified privilege in an assault and battery suit is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." Id. at 730. The objective piece of the qualified privilege analysis is "similar to

-50-

the excessive force standard applied in the Section 1983 context."

Dormu v. District of Columbia, 795 F. Supp. 2d 7, 27 (D.D.C. 2011).

In addressing Plaintiff's Section 1983 claims, the Court concluded that a rational jury could conclude that Officer Shipman-Meyer's use of a chokehold was not objectively reasonable. That conclusion applies with equal force to the claim of qualified privilege. Accordingly, Officer Shipman-Meyer is not entitled to qualified privilege on Plaintiff's assault and battery claim at the summary judgment stage.

Plaintiff is also not entitled to summary judgment on his assault and battery claim. In his deposition, Officer Shipman-Meyer testified to his subjective fear for his life. Defs.' Analysis of Material Facts at ¶ 24. And, as discussed above, when the evidence is viewed in a light most favorable to the Defendants a rational jury could conclude that his use of force was objectively reasonable. Accordingly, a jury could reasonably conclude that Officer Shipman-Meyer had a qualified privilege to place and maintain a chokehold on Mr. Chambers.

Consequently, neither party is entitled to summary judgment on the issue of whether Officer Shipman-Meyer committed assault and battery.

**b. Defendants Are Entitled to Summary Judgment on the Claim that the other Three Officers Committed Assault and Battery**

Defendants argue that they are entitled to summary judgment on Plaintiff's theory that one or more of the other three officers – Karabelas, LaDuca, or Rose – aided and abetted Officer Shipman-Meyer because it is without merit.

In the District of Columbia, a person aiding or abetting the principal offender in the commission of a crime is held as liable as the principal.  D.C. Code § 22-1805.  "Aiding and abetting is established if the accused 'in some sort associated himself with the venture, participated in it as in something that he wished to bring about, and sought by his action to make it succeed.'"  Hackney v. U.S., 389 A.2d 1336, 1342 (D.C. 1978), cert. denied, 439 U.S. 1132 (1979) (internal citations, quotation marks, and ellipses omitted).  However, to prove that a person is an accessory who aided and abetted the principal, "there must exist a community of unlawful intent between the accessory and the perpetrator of the crime."  Id.

Plaintiff's aiding and abetting claim is without any merit because he has presented no evidence establishing a community of unlawful intent between Officer Shipman-Meyer and any of the other three officers.  There is no evidence that any of these three shared an intent with Officer Shipman-Meyer that he unnecessarily

-52-

choke, let alone harm, Mr. Chambers.   At best, the evidence suggests that they intended to restrain Mr. Chambers, which was entirely lawful given his assault of the officers, and that when Officer Shipman-Meyer used a chokehold to do so, they did not actively intervene once it became clear that the chokehold was no longer necessary.   Those facts are insufficient to establish the requisite criminal state of mind on the part of any of the other officers.

Therefore, Defendants are entitled to summary judgment on the claim that Officers Karabelas, LaDuca, and Rose aided and abetted an assault and battery.

### 2. Count One: Claim of Negligence by Officer Shipman-Meyer

Plaintiff alleges in his First Amended Complaint that Officer Shipman-Meyer's use of a chokehold violated a national standard of care and was therefore negligent.   FAC at ¶ 11.

"[A] municipality may choose to hold its officers to a stricter standard than the Constitution requires."   Scales v. D.C., 973 A.2d 722, 730 (D.C. App. 2009) (internal citations and quotation marks omitted).   Thus, even where an officer does not violate a suspect's constitutional rights, he may still be liable under a different, heightened standard of care that is established by the District of Columbia.   Id.   "In order to prevail on a

-53-

negligence cause of action, the plaintiff must prove the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury."   Id.

Plaintiff argues that the District of Columbia Limitation on the Use of the Chokehold Act of 1985 ("Chokehold Act"), D.C. Law 6-77, establishes such a heightened standard of care.   First, it prohibits officers from ever using tracheal holds.   DC Code Ann. § 5-125.03(a).   Second, it prohibits officers from using carotid holds unless: 1) an officer has been trained in the use of carotid holds; and 2) lethal force is necessary to protect the life of a civilian or another officer.   Id. at §§ 5-125.03(a),(a)(1).   Third, it requires an officer who has used a carotid hold to render immediate first aid and medical treatment to the suspect if he becomes unconscious as a result of the hold.   Id. at § 5-125.03(a)(2).

In Plaintiff's Motion for Summary Judgment, he advances three distinct theories of negligence based on the Chokehold Act.   First, he argues that Officer Shipman-Meyer applied a tracheal hold to Mr. Chambers, and that this was negligent in light of the statute's prohibition on tracheal holds.   Pl.'s MSJ at 8-11.   Alternatively, he argues that even if Officer Shipman-Meyer used a carotid hold, he was negligent because he had not received training on the use

-54-

of carotid holds, which is a prerequisite to their use.  Pl.'s MSJ
at 17-18.   Finally, he argues that Officer Shipman-Meyer was
negligent because he failed to immediately provide first aid and
emergency medical treatment to Mr. Chambers after he was subdued
as required by the Chokehold Act.   Pl.'s MSJ at 18-19. Plaintiff
has moved for summary judgment on all three theories.

Defendants have also cross-moved for summary judgment.
First, they argue that Plaintiff cannot state a claim for
negligence, because the allegedly negligent conduct is wholly
subsumed within his assault and battery claim.   Defs.' MSJ at at
21-22.   Second, Defendants argue that - as a matter of law -
Officer Shipman-Meyer did not proximately cause injuries to Mr.
Chambers, because Mr. Chambers' assault of the officers was an
intervening and superseding cause of his injuries.

### a. Plaintiff's Negligence Claim Is Distinct from his Assault and Battery Claim

Defendants argue that Plaintiff cannot state a claim for
negligence that is distinct from his claim for assault and battery.
Defs'. MSJ at 21-22 (citing District of Columbia v. Chinn, 839
A.2d 701, 711 (D.C. 2003)).

"Under District of Columbia law, a plaintiff who
simultaneously asserts claims for negligence and assault and
battery based on excessive force must ensure that the negligence

claim is: (1) 'distinctly pled;' (2) 'based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself;' and (3) 'violative of a distinct standard of care.'" Dormu v. D.C., 795 F. Supp. 2d at30 (quoting Chinn, 839 A.2d at 711).[13]

Contrary to Defendants' argument, Plaintiff satisfies Chinn's three requirements. First, Plaintiff has pled his negligence claim separately from his claims for assault and battery. See FAC at ¶¶ 8-13, 14-17 (setting forth distinct claims for negligence, Count One, and assault and battery, Count Two).

Second, all three of Plaintiff's theories of negligence are "based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself." Chinn at 711.    Plaintiff argues that Officer Shipman-Meyer violated this standard of care by mistakenly employing a tracheal chokehold when, at most, a carotid hold was authorized.   This claim shares one of the features the Chinn court identified as common in cases

---

[13] "These requirements stem from the different states of mind that each theory of liability requires. Battery and assault are intentional torts. Negligence is not. 'Intent and negligence are regarded as mutually exclusive grounds of liability. As the saying goes, there is no such thing as a negligent battery.' The D.C. Court of Appeals has nonetheless held that there are 'certain circumstances in which the events surrounding the application of excessive force may lend themselves to a theory of negligence as well' as assault and battery. Dormu, 795 F. Supp. 2d at 30 (quoting Chinn, 839 A.2d at 706-07).

where plaintiffs have been allowed to proceed, namely a possible 'misperception of fact.' See Chinn, 839 A.2d at 711; Dormu, 795 F. Supp. 2d at 30.   Whether Officer Shipman-Meyer knew he was using a tracheal hold rather than a carotid hold is the kind of factual mistake relevant to whether he acted negligently.

Alternatively, Plaintiff argues that if Officer Shipman-Meyer used a carotid hold, he violated the standard of care because he was not trained in their use as required by statute.   Whether Officer Shipman-Meyer was trained in the use of carotid holds is factually distinct from the question of whether the circumstances made it reasonable to place Mr. Chambers in a carotid hold in the first place.   For the very same reason, Plaintiff's argument that Officer Shipman-Meyer failed to treat Mr. Chambers after he had been subdued is totally factually distinct from the facts underlying his assault and battery claim.

Third, Plaintiff's allegations satisfy the final Chinn requirement that there be a violation of a "distinct standard of care."   Chinn, 839 A.2d at 711.   Plaintiff alleges that District of Colmbia law establishes a distinct standard of care with regard to the use of force - prohibiting the use of tracheal holds in all instances and only authorizing the use of carotid holds by officers who have been trained.   This is distinct from the standard of care

under his assault and battery claim, which requires only that the officer's use of either type of chokehold be reasonable under the circumstances.   Plaintiff's failure-to-treat claim alleges that officers who employ carotid holds are required to treat a suspect after they have been subdued, which is obviously a distinct standard of care than whether an officer's use of a carotid hold is reasonable.

Consequently, Plaintiff's claims that Officer Shipman-Meyer acted negligently are distinct from his assault and battery claims.

> b. **The Court Will Not Resolve at this Time Defendants' Argument that Mr. Chamber's Intentional Acts of Violence Were a Superseding Cause of his Injuries**

Defendants also argue that even if Plaintiff could establish that Officer Shipman-Meyer caused Chambers' death, Chambers' original assault on the officers was a superseding cause of his own injuries, and therefore that Plaintiff cannot succeed on his negligence claim as a matter of law.   Defs.' MSJ at at 22-24.

"In order to prevail on a negligence cause of action," one of the necessary elements a plaintiff must prove is "a causal relationship between that deviation and the plaintiff's injury." Scales, 973 A.2d at 730.   "D.C. follows the black-letter tort law principle that an intervening force breaks the chain of proximate causation   when   that   intervening   force   is   sufficiently

-58-

unforeseeable as to constitute a superseding cause." <u>Hundley v.
District of Columbia</u>, 494 F.3d 1097, 1104-05 (D.C. Cir. 2007).
The commission of a crime is ordinarily such an intervening force.
<u>Id.</u>   Consequently, Defendants argue that as a matter of law,
Officer Shipman-Meyer's conduct cannot be a proximate cause of
Plaintiff's injuries, because Mr. Chambers intentionally assaulted
the officers and that assault was not foreseeable.

Plaintiff counters that the Chokehold Act establishes the
relevant standard of care, and on its face, the Chokehold Act
appears to fully foresee violent conduct such as that committed by
Mr. Chambers.   A statute or regulation may establish the relevant
standard of care where its purpose is, in part, to protect a
particular class of persons or to protect against a particular
type of harm.   <u>See</u> Restatement (Second) of Torts § 286 (1965).
"At a minimum [] the statute or regulation relied on must promote
public safety and have been enacted to protect persons in the
plaintiff's position or to prevent the type of accident that
occurred." <u>See</u> <u>McNeil Pharm. v. Hawkins</u>, 686 A.2d 567, 579 (D.C.
App. 1996)

The Chokehold Act appears to be precisely this kind of public
safety statute.   The Chokehold Act establishes strict limits on
the use of chokeholds by the police.   <u>See</u> DC Code Ann. §§ 5-125.01

– 5-125.03. These limits were established because the District of Columbia Council determined that the unrestricted use of chokeholds "presents an unnecessary danger to the public." Id. at § 5-125.01. Thus, the text of the statute suggests it was designed to "prevent the type of accident that occurred." See McNeil Pharm., 686 A.2d at 579.

Moreover, the text of the statute suggests that these protections were intended to apply to individuals in Mr. Chambers' position. The Chokehold Act categorically bans the use of tracheal holds "by any police officer...under any circumstances." DC Code Ann. § 5-125.03(a). It also bans the use of carotid holds, "except under those circumstances and conditions under which the use of lethal force is necessary to protect the life of a civilian or a law enforcement officer." Id.

Thus, on its face, the Chokehold Act contemplates that police officers may confront an individual who is so violent, that she poses a threat to the life of the officer or others. Even under such extreme circumstances, the Chokehold Act establishes a standard of care police must comply with by: 1) prohibiting the use of tracheal holds; and 2) only allowing carotid holds by officers trained in their use. In all other circumstances, including those where a suspect is violent but does not threaten

the lives of the officers or others, the Chokehold Act bars police officers from using either tracheal or carotid holds.

Thus, in enacting the Chokehold Act, the Council appeared to have fully foreseen the situation presented in this case - a suspect violently resisting the police - and it prescribed specific rules of conduct for the police to follow for the purpose of protecting that violent individual from the harm posed by chokeholds. Accordingly, Mr. Chambers' assault of the police officers does not appear to be an unforeseeable, superseding act.

Of course, this all presumes that the Chokehold Act is in fact a public safety statute that establishes a distinct standard of care. Whether that is the case appears to be a question of first impression. Resolution of that question is a "purely a judicial [decision], for the court to make," based on a detailed inquiry into the statute's purposes. See McNeil Pharm., 686 A.2d at 579 (internal citations and quotations omitted).

Unfortunately, the answer to that question has received little, if any, briefing on the merits by the Parties. In his First Amended Complaint, Plaintiff alleged that the Defendants' conduct was negligent because it violated a "national standard of care required of Police Officers in such circumstances." FAC at ¶ 11. However, a statute of the District of Columbia cannot establish a

-61-

national standard of care, and therefore his First Amended Complaint did not properly raise this argument. It was not until he filed his Motion for Summary Judgment that Plaintiff first argued that the Chokehold Act established the governing standard of care.

The Court may disregard a claim raised for the first time in a memorandum of law. Tunica-Biloxi Tribe of La. v. U.S., 577 F. Supp. 2d 382, 411 (D.D.C. 2008). However, it is inappropriate to strike the newly-raised claim if the "factual basis for [her] new claim is substantially similar" to a claim already alleged in her complaint. Wiley v. Glassman, 511 F.3d 151, 159 (D.C. Cir. 2007). If the court dismisses the newly-raised claim, the court must afford the plaintiff leave to amend her complaint to include it. See Tunica-Biloxi Tribe, 577 F. Supp. 2d at 411.

Given that this is a question of first impression, involving the interpretation of a statute of the District of Columbia, and the absence of substantive briefing, Plaintiff's claim of negligence based on violations of the Chokehold Act is not properly before the Court and the Court will not consider it. Plaintiff

may seek leave to amend his First Amended Complaint to include this claim.[14]

However, with regard to Plaintiff's existing negligence claim contained in Count One of the First Amended Complaint, Plaintiff has not even attempted to establish the existence of a <u>national</u> standard of care, let alone succeeded. Accordingly, Defendants' Motion for Summary Judgment on this claim will be granted, and Plaintiff's Motion for Summary Judgment on this claim will be denied.

### 3. Count Five: Neither Party Is Entitled to Summary Judgment on the Claim of Negligent Training by the District of Columbia

Plaintiff also alleges that the District was negligent in failing to train its officers as to when chokeholds were authorized under the Chokehold Act. FAC at 26-32.

---

[14] Plaintiff has also moved for summary judgment on the issue of whether Defendants may assert the defenses of contributory negligence and assumption of the risk. Pl.'s MSJ at 27-28. Whether these defenses bar Plaintiff's negligence claim hinges on whether the Chokehold Act is a public safety statute. <u>Martin v. George Hyman Const. Co.</u>, 395 A.2d 63, 69-74. (D.C. App. 1978) (assumption of the risk and contributory negligence are not a bar to a claim of negligence based on deviation from a standard of care established by a public safety statute). Accordingly, these arguments cannot be resolved unless and until Plaintiff amends his Complaint.

### a. Defendants Are not Entitled to Summary Judgment because Mr. Chambers Conduct Was not a Superseding Act

Defendants have moved for summary judgment, arguing that Mr. Chambers' assault on the police officers was an intervening and superseding factor and that Plaintiff cannot show causation. Defs.' MSJ at 23-24. They contend that the D.C. Circuit's decision in Hundley prevents a plaintiff who assaults a police officer from bringing a claim of negligent training against MPD because the plaintiff's violent conduct was a superseding cause of her own injuries. See Defs.' MSJ at 23-24 (citing Hundley, 494 F.3d at 1104-05).

The Defendants' arguments make far too much out of Hundley, which announced a fairly limited principle: when an officer is negligent in initially seizing an individual, it is not foreseeable that the person seized will violently assault the officer. 494 F.3d at 1104-05. Therefore, the officer's original seizure - however negligent - is not the proximate cause of any harm that results from the officer's subsequent use of force. Id.

In contrast, it should be foreseeable to any police department that its officers, in the regular course of duty, will encounter individuals who commit crimes, including assault on the officers themselves. Because violence against officers is foreseeable at

-64-

the departmental-level, police department policies on the use of force must appropriately train the officers on how to respond.

Indeed, the history of negligent training claims in the District suggests that Hundley does not have the reach Defendants claim.    Plaintiffs in the District of Columbia have regularly advanced claims that MPD was negligent in training its officers. In many of those cases, the plaintiff first assaulted the officer before the allegedly excessive force was used.    Yet, the courts have not barred those claims on the principle that the plaintiff's criminal activity was a superseding cause of their injuries.    See e.g. District of Columbia v. Peters, 527 A.2d 1269 (D.C. 1987) (plaintiff who struck officer before officer used force able to proceed on negligent training claim only if he introduced expert testimony); District of Columbia v. White, 442 A.2d 159 (D.C. 1982).

As this is the only basis on which Defendants have moved for summary judgment on this count, their Motion must be denied.

### b. Plaintiff Is Not Entitled to Summary Judgment because He Cannot Establish Causation

Plaintiff has also moved for summary judgment, asserting that it is "axiomatic" that MPD's failure to train its officers on the use of force was negligent. Indeed, Plaintiff appears so sure of

his claim that he has failed to cite to a single case or proposition of law in support. See Pl.'s MSJ at 26-27.

As stated above, "in order to prevail on a negligence cause of action, the plaintiff must prove the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between that deviation and the plaintiff's injury." Scales, 973 A.2d at 730. Plaintiff can satisfy the first two elements but not the third.

Plaintiff's expert provided his opinion that the national standard of care requires a police force to train its officers on applicable laws and policies governing the use of force. Supplemental Expert Report by Robert Klotz ("Klotz Report), Exh. 14 to Pl.'s MSJ [Dkt. No. 56-1]. He further opined that MPD deviated from that standard of care, because MPD does not properly train officers on the limitations established in the Chokehold Act. Id. (noting that MPD has itself identified improper training as a problem (citing District of Columbia, Police Complaints Board, Improving MPD's Policy on the Use of Chokeholds and other Neck Restraints (August 10, 2015) (available at https://policecomplaints.dc.gov/chokeholds-neckrestraints))).

However, Plaintiff cannot establish that this failure-to-train caused Mr. Chambers' injuries. When the facts are viewed in a light most favorable to Defendants, a jury could reasonably

conclude that Mr. Chambers posed a threat to the life of the officers.   Given that threat, the Chokehold Act authorizes an officer to use a carotid hold to subdue a suspect, which is what Officer Shipman-Meyer claims he did.   Accordingly, even if Officer Shipman-Meyer had been properly trained, Mr. Chambers might still have died, in which case the failure-to-train was not the cause of his injuries, and Plaintiff is not entitled to Summary Judgment.

### 4. Count Four: The Defendants Are not Entitled to Summary Judgment on Plaintiff's Wrongful Death Claim

Plaintiff has not moved for summary judgment on their wrongful death claim but Defendants have done so.

Plaintiff's wrongful death claim is based on D.C. Code § 16-2701.   The Parties agree that to succeed under the statute, Plaintiff must prove both: 1) an "underlying tort (common law or constitutional);" and 2) "injury to the survivor," here Mr. Ingram.

Defendants argue that they are entitled to summary judgment because Plaintiff cannot show any underlying tort.   Defs.' MSJ at 24-25.   However, as discussed above, Plaintiff certainly has a viable claim of assault and battery under DC law.   That is sufficient to maintain his claim for wrongful death.   Accordingly, Defendants are denied summary judgment on this Count.

## IV.   CONCLUSION

For the foregoing reasons, the judgment of the Court is as follows:

Plaintiff's Motion for Summary Judgment is denied in its entirety;

Plaintiff's claims that Officer Shipman-Meyer's conduct was negligent, in light of a standard of care established by the Chokehold Act, were improperly raised for the first time in a memorandum of law and are not properly before the Court;

Nonetheless, Plaintiff may seek leave to further amend its First Amended Complaint to include these negligence claims;

Defendant's Motion for Summary Judgment is granted in part, as to Count One of Plaintiff's First Amended Complaint, in so far as it alleges negligence based on violation of a national standard of care, and as to Count Two, in so far as it alleges that Officers Karabelas, LaDuca, and Rose aided and abetted Officer Shipman-Meyer's assault and battery of Mr. Chambers, and denied in part, as to all other remaining Counts.


March 20, 2017

Gladys Kessler
United States District Judge


**Copies to:** attorneys on record via ECF